ORAL ARGUMENT REQUESTED BUT NOT YET SCHEDULED

Appeal No. 14-1150

---

IN THE UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA

---

**CENTER FOR REGULATORY REASONABLENESS,**

**Petitioner**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

**Respondent**

---

Petition for Review of Respondent Agency's Promulgations and Approvals of Effluent Limitations and Other Limitations

---

## BRIEF OF AMICUS CURIAE THE NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES IN SUPPORT OF THE CENTER FOR REGULATORY REASONABLENESS

Jeffrey S. Longsworth
BARNES &
THORNBURG LLP
1717 Pennsylvania
Avenue N.W.
Suite 500
Washington, D.C. 20006
(202) 408-6918

Erika K. Powers
Jill M. Fortney
BARNES &
THORNBURG LLP
One North Wacker Dr.
Suite 4400
Chicago, Illinois 60606
(312) 338-5904

Amanda Waters
National Association of
Clean Water Agencies
1816 Jefferson Place, NW
Washington, DC 20036
(202) 533-1803

October 30, 2015

## 26.1 Disclosure Statement

Pursuant to D.C. Circuit Rule 26.1, the National Association of Clean Water Agencies ("NACWA") makes the following disclosures:

1.    NACWA has no parent corporation.

2.    No publicly held corporation owns more than 10% of NACWA's stock.

3.    NACWA is a trade association of more than 300 public agencies that pursue scientifically-based, technically sound, and cost-effective laws and regulations regarding wastewater treatment.

## Certificate as to Parties, Rulings, and Related Cases

Pursuant to Circuit Rule 28(a)(1), I hereby certify as follows:

(A)    **Parties and Amici.**  In addition to the parties listed in the Brief for Appellants, NACWA has now filed a brief as amicus curiae in this case.

(B)    **Rulings under Review.**  References to the rulings at issue appear in the Brief for Appellants.

(C)    **Related Cases.**  Amici curiae are not aware of any related cases within the meaning of Circuit Rule 28(a)(1), other than *Iowa League of Cities v. E.P.A.*, 711 F.3d 844 (8th Cir. 2013).


Dated: October 30, 2015                    /s/ *Jeffrey S. Longsworth*
                                           *Counsel for Amicus Curiae*

ii

## Table of Contents

26.1 Disclosure Statement ................................................................ i

Certificate as to Parties, Rulings, and Related Cases ............................... ii

Table of Contents .................................................................... iii

Table of Authorities ................................................................ iv

Glossary of Abbreviations ........................................................... vi

Statutes And Regulations ............................................................ vii

Statement of Interest ................................................................1

Summary of Argument .................................................................2

Argument............................................................................3

    I.  Factual and procedural history. .....................................................3

    II. The Agency's interpretation violates the Act by attempting to regulate flows inside the facility rather than at the point of discharge. ...............................10

    III. The Agency's interpretation of the bypass rule violates the Act. .................13

    IV.    Conclusion...................................................................14

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements ...................................................16

Certificate of Service ...............................................................17

# Table of Authorities<sup>*</sup>

## Cases

*Am. Iron and Steel Inst. v. E.P.A.*, 115 F.3d 979 (D.C. Cir. 1997)..........................12

*Arkansas v. Oklahoma*, 503 U.S. 91 (1992) .............................................................3

\*_Iowa League of Cities v. E.P.A._, 711 F.3d 844 (8th Cir. 2013)...........................2, 9

*Natural Resources Defense Council, Inc. v. E.P.A.*, 822 F.2d 104 (D.C. Cir. 1987) .......................................................................................................................13

## Statutes

33 U.S.C. § 1311(a) ....................................................................................................3

33 U.S.C. § 1311(b)(1)(B) .......................................................................................10

33 U.S.C. § 1342 ........................................................................................................3

*33 U.S.C. § 1362(11) ......................................................................................... 3, 4, 11

33 U.S.C. § 1362(12) .................................................................................................3

33 U.S.C. § 1369(b)(1)..............................................................................................10

## Regulations and Guidance

*40 C.F.R. § 122.41(m) .........................................................................................1, 13

*40 C.F.R. § 122.41(m)(1)...........................................................................................7

*40 C.F.R. § 122.45(a).................................................................................................4

*40 C.F.R. § 122.45(h)(1)......................................................................................4, 11

*40 C.F.R. § 125.3(a)...........................................................................................4, 11

40 C.F.R. § 133.100 *et seq*......................................................................................1

---

<sup>*</sup> Authorities upon which NACWA chiefly relies are denoted with asterisks (*).

**Other**

"Decision on Blending, Mixing Zones to Apply Case-by-Case Outside the 8th Circuit, EPA Says," 44 Env't Rep. (BNA) 3479 (Nov. 20, 2013) (Petitioner's Exhibit 44)........................................................................................10

53 Fed. Reg. 40,562 (Oct. 17, 1988).................................................................7, 13

*68 Fed. Reg. 63042 (Nov. 7, 2003) .................................................................8, 11

70 Fed. Reg. 76,013 (Dec. 22, 2005) ....................................................................8

EPA,  EPA-833-K-10-001, NPDES Permit Writers' Manual (2010) .......................4

## **Glossary of Abbreviations**

| | |
|---|---|
| POTWs | Publicly Owned Treatment Works |
| NPDES | National Pollutant Discharge Elimination System |
| Act or CWA | Clean Water Act |
| EPA or Agency | U.S. Environmental Protection Agency |
| CRR | Center for Regulatory Reasonableness |
| NACWA | National Association of Clean Water Agencies |

**Statutes And Regulations**

With the exception of 33 U.S.C. § 1311(a), 33 U.S.C. § 1342, and 33 U.S.C. §§ 1362(11) & (12), all pertinent statutes and regulations are contained in the Statutory & Regulatory Addendum to Brief for Petitioner.  The aforementioned statutes and regulations are contained in an addendum at the end of this brief.

## Statement of Interest[1]

NACWA is a voluntary, non-profit trade association that represents the interests of the nation's publicly owned wastewater and stormwater utilities. NACWA's membership includes nearly 300 municipal regional entities located across the country that manage publicly owned treatment works ("POTWs") and other water collection, treatment, and discharge facilities. NACWA is the leading advocacy organization for the nation's POTWs. NACWA and its members have been involved in the legal and regulatory issues at stake in this litigation for over 20 years.

NACWA's members stand to be harmed by the U.S. Environmental Protection Agency's ("EPA" or the "Agency") re-interpretation of existing legislative rules, including the bypass and secondary treatment rules (40 C.F.R. § 122.41(m) and 40 C.F.R. § 133.100 *et seq*).[2] The Agency's current re-interpretation of these rules—an about-face from its longstanding practice and contrary to the plain language of the rules as adopted—is erroneous and beyond the

---

[1] Pursuant to Rule 29(c)(5) of the Rules of the Court, NACWA states that no counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than NACWA, its members, or its counsel, made a monetary contribution to its preparation or submission.

[2] In a survey of 34 NACWA member municipal agencies, the agencies indicated that they would need to spend in excess of $5.1 billion to meet EPA's new requirements.

Agency's legal authority under the Clean Water Act ("CWA" or the "Act"), as defined by the Eighth Circuit in *Iowa League of Cities v. E.P.A.*, 711 F.3d 844 (8th Cir. 2013). This re-interpretation, and the Agency's refusal to abide by the Eighth Circuit ruling for POTWs nationwide, will also impose high costs on NACWA's members without any significant improvement in water quality. In fact, it could result in increased overflows of raw sewage and basement backups.

Petitioner Center for Regulatory Reasonableness ("CRR") has not indicated any objection to the filing of this brief, and Respondent EPA has indicated it has no objection. Additionally, as discussed in NACWA's Motion for Leave to File as Amicus Curiae, NACWA's brief will assist the Court by providing information and arguments regarding the economic and environmental effects of the Agency's current interpretation of the bypass and secondary treatment rules, as well as its effect on NACWA members and hundreds of other POTWs across the country.

## Summary of Argument

The Eighth Circuit correctly determined that EPA cannot use the secondary treatment and bypass rules to place effluent limitations on or regulate the flow of water inside a POTW facility, and can only regulate effluent quality at the final point of discharge. *Iowa League of Cities*, 711 F.3d at 877. This Court should reject EPA's announced decision that the holding of *Iowa League of Cities* applies only in the Eighth Circuit, and confirm that EPA has once again exceeded its

statutory and regulatory authority by classifying blending as a prohibited bypass, thereby prohibiting POTWs from making maximum use of primary treatment units to cope with peak wet weather flows. Furthermore, this Court should confirm that EPA cannot bar POTWs from treating peak wet weather flows using available primary treatment capacity and disinfection when biological treatment is not available. The bypass rule does not apply to facilities that operate as designed, and the blending process subject to this case is precisely how POTWs have designed their systems to operate during wet weather events.

## Argument

### I.    Factual and procedural history.

The Clean Water Act prohibits the discharge of pollutants into navigable waters from any point source, unless that discharge complies with the Act's provisions. 33 U.S.C. §§ 1311(a), 1362(12). The National Pollutant Discharge Elimination System ("NPDES") permit program allows individual dischargers, including POTWs, to obtain permits that include effluent limitations governing the discharge of pollutants to the waters of the United States. 33 U.S.C. § 1342. "Effluent limitations," are defined as the "quantities, rates, and concentrations of specified substances . . . discharged from point sources" into navigable waters. *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (citing 33 U.S.C. §§ 1311, 1314); 33 U.S.C. § 1362(11). The Act requires these limitations to be applied at the point

of discharge, except in limited circumstances inapplicable here.  33 U.S.C. § 1362(11); 40 C.F.R. §§ 122.45(a), (h)(1).

Certain effluent limitations are technology-based, meaning that they "set a minimum level of effluent quality that is attainable using demonstrated technologies," but do not require that any particular technology be used.  EPA, EPA-833-K-10-001, NPDES Permit Writers' Manual (2010), 5–1.  For POTWs, these requirements include effluent limitations based upon secondary treatment technologies.  40 C.F.R. § 125.3(a).  As effluent limitations, secondary treatment requirements must be applied at the point of discharge.  33 U.S.C. § 1362(11); 40 C.F.R. § 122.45(a).

In order to comply with applicable effluent limitations, POTWs generally structure their facilities so that untreated wastewater flowing into the plant (influent) moves through basic, or primary, treatment processes and then through secondary and sometimes other treatment processes before being disinfected and discharged.[3]  Secondary treatment processes are usually biologically based, meaning that they use bacteria or other organisms in a "bio-reactor" to treat influent to meet effluent standards based on secondary treatment.  Successful biological treatment depends on maintaining a delicate and sensitive balance of

---

[3] Some POTWs may utilize other treatment processes for peak wet weather flows, in addition to primary treatment and disinfection, if necessary to comply with permit requirements.

organisms, pollutants, and water.   Biological treatment systems rely on the continuous flow of effluent into the system, within certain limits, to maintain the biomass and adequately treat wastewater.

The biological treatment process is a proven and efficient means to treat wastewater to attain secondary treatment-based effluent quality requirements, but that process also has certain inherent limitations.  For example, the growth rate of the biomass used to provide secondary treatment is too slow to adjust to sudden changes in influent, such as increases in flows that are inherent in large wet weather events.[4]  As a result, when peak wet weather flows are forced through the biological treatment equipment, the biomass can be washed out of the treatment process, disrupting the entire system.  POTWs must then restore the biological balance of the treatment system.  During the restoration period, the treatment process has reduced efficacy, adversely affecting water quality and impairing the ability of POTWs to meet applicable effluent limitations.  Additionally, peak wet weather flows themselves are often much more dilute than non-peak flows, in terms of pollutant strength.  Because the organisms in a biological treatment

---

[4] The increased flow to POTWs from wet weather events can often be at least two to three times greater than the normal dry weather flow, sometimes significantly higher.  POTWs are designed to maximize the amount of this wet weather flow to the plant to receive adequate treatment and avoid overflows of untreated sewage while also not "washing/flushing out" the critical biological treatment systems at the treatment plant.

process feed off the pollutants in normal POTW influent, they may not be able to survive on dilute wet weather flows; essentially, they starve. Accordingly, even if the biomass were able to withstand unpredictable, intermittent spikes in flow volume, treatment effectiveness would still be compromised during wet weather events. This issue is even more critical for flow-sensitive biological nutrient removal processes.

To achieve applicable effluent limitations during wet weather and protect biological treatment systems, many POTWs were designed to make maximum use of available primary treatment capacity and then treat excess wet weather flows in a disinfection process. These designs were approved and often funded by EPA as the most environmentally responsible and cost-effective treatment method to address increased flow from variable wet weather events. To avoid impairment of the biological treatment process and make maximum use of available primary treatment capacity, POTWs designed in this manner typically route a portion of the peak wet weather flow through primary treatment only, then combine the flow with flows routed through both primary and biological processes. The combined flows are disinfected before they are discharged.

This combined (or "blended") discharge still must comply with all applicable effluent limitations, including technology-based secondary treatment requirements and water quality-based requirements. Accordingly, even under the

6

wet weather management technique described above, all legal and regulatory discharge requirements are met. Without the ability to maximize use of primary capacity and blend flows in this manner, POTW facilities would have substantially less capacity to treat peak wet weather flows. As a consequence, there may be increased raw sewage overflows from the collection system during wet weather events as peak wet weather flows back up in the system instead of receiving primary treatment and disinfection at the plant. Blending allows facilities to reduce untreated overflows and possible sewage backups into buildings, while also maintaining environmentally sound and cost-effective treatment that meets both technology- and water quality-based standards.

In addition to effluent limitations contained in NPDES permits, dischargers must comply with the federal bypass rule, which governs the "intentional diversion of waste streams from any portion of a treatment facility." 40 C.F.R. § 122.41(m)(1). The purpose of this rule is to "ensure that users properly operate and maintain their treatment facilities and thus fulfill the purpose and assumptions underlying technology-based standards." 53 Fed. Reg. 40,562, 40609 (Oct. 17, 1988). In other words, the goal of the bypass rule is to ensure that dischargers operate their facilities by using all designed features and equipment. *Id.*

For decades, EPA understood that the Act permits the practice of blending as a means of coping with peak wet weather flows, while also meeting applicable

7

technology-based requirements.  As discussed above, EPA frequently funded and approved POTW designs that utilized blending.  In 2003, EPA issued a request for comment on a proposed policy confirming that this practice was not a prohibited bypass under the applicable rules and recognizing that effluent limitations, such as those based on secondary treatment, are applied at the point of discharge:

> Peak wet weather discharges from POTWs that consist of effluent routed around biological or other advanced treatment units blended together with the effluent from the biological units (or from other advanced treatment units) prior to discharge would not be a prohibited bypass.

68 Fed. Reg. 63042, 63,049 (Nov. 7, 2003).

In 2005, however, EPA changed course, and proposed a new draft policy characterizing blending as a prohibited bypass, to be used only if there are "no feasible alternatives."[5]  70 Fed. Reg. 76,013, 76,015 (Dec. 22, 2005).  If a feasible alternative to blending can be found, this draft policy requires a POTW to construct and operate new technology and internal structures to treat peak wet weather flow.  Although the 2005 proposal was never finalized, EPA has embraced

---

[5] NACWA strongly supported EPA's 2003 proposal.  When it became evident the 2003 policy would not be finalized, NACWA agreed to an EPA request to help draft the 2005 proposal in an effort to maintain blending as a viable treatment option.  Unfortunately, even though the 2005 proposal was never finalized, EPA began implementing its re-interpretation of the secondary treatment and bypass rules in a manner inconsistent with NACWA's intent as a co-author of the proposed policy.  NACWA no longer supports the 2005 proposal as an appropriate legal or regulatory approach to blending.

the new re-interpretation as an enforceable requirement, and has declared blending to be a prohibited bypass in certain permits issued after 2005.  By deeming blending to be a prohibited bypass, EPA has, in effect, barred POTWs that use blending from operating their facilities as designed and legally permitted, and also prevented the design of new plants with blending processes for peak wet weather flows.

In 2011, the Iowa League of Cities successfully challenged EPA's unlawful modification of the secondary treatment and bypass rules.  *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 854 (8th Cir. 2013).  The Eighth Circuit found that EPA had announced a legislative rule in violation of the Administrative Procedure Act by prohibiting blending without finalizing a rule and that EPA had exceeded its statutory authority by attempting to regulate pollutant levels in a facility's internal waste stream rather than at the point of discharge.  *Id.* at 877 ("insofar as the blending rule imposes secondary treatment regulations on flows within facilities, we vacate it as exceeding the EPA's statutory authority").

EPA insists that the *Iowa League of Cities* ruling applies only within that Circuit, and maintains that its re-interpretation of the secondary treatment and blending rules—which was vacated by the Eighth Circuit—does not exceed its

9

authority under the Act.[6]  Petitioner CRR brought this follow-up challenge in the Circuit Court of Appeals for the District of Columbia pursuant to Section 509 of the Act, 33 U.S.C. § 1369(b)(1).  Among other things, CRR asks this Court to determine that EPA's interpretation of the secondary treatment and bypass rules is unauthorized under the Act.

## II.    The Agency's interpretation violates the Act by attempting to regulate flows inside the facility rather than at the point of discharge.

The Act gives EPA authority to impose secondary treatment requirements only at the point of discharge.  The Agency's re-interpretation of the secondary treatment and bypass rules to prohibit blending is directed at internal processes, and is thus not authorized by the Act.  As discussed in Section I, *supra*, the Act permits EPA to set "effluent limitations based upon secondary treatment" for POTWs in NPDES permits.  33 U.S.C. § 1311(b)(1)(B); 40 C.F.R. 125.3(a).  The Act defines "effluent limitations" as:

> [A]ny restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents

---

[6] EPA announced this policy at a NACWA law conference on November 20, 2013, when EPA's Acting Assistant Administrator for Water indicated that the Agency would follow the *Iowa League of Cities* opinion within the Eighth Circuit, but considered the ruling "not binding" outside the Eighth Circuit.  "Decision on Blending, Mixing Zones to Apply Case-by-Case Outside the 8th Circuit, EPA Says," 44 Env't Rep. (BNA) 3479 (Nov. 20, 2013) (Petitioner's Exhibit 44) ("Outside the Eighth Circuit, we will be looking on a case-by-case at situations in particular communities to see what makes sense.").

which are *discharged from point sources into navigable waters*, the waters of the contiguous zone, or the ocean, including schedules of compliance.

33 U.S.C. § 1362(11) (emphasis added). Consistent with that definition, the Agency's own rules require effluent limitations to be established for "each outfall or discharge point," and applied only "at the point of discharge" unless impractical or infeasible.[7] 40 C.F.R. §§ 122.45(a), (h)(1).

In 2003, EPA reiterated that blending was thoroughly consistent with and authorized by the rules adopted decades earlier, and confirmed that POTWs are not required to use particular processes (such as biological treatment) for flows inside the facility, but instead must meet effluent limitations at the point of discharge:

> EPA promulgated the secondary treatment regulations at 40 CFR part 133 to define <u>minimum levels of effluent quality</u> for publicly owned treatment works (POTWs) <u>prior to discharge</u>.
>
> …
>
> [T]he secondary treatment regulations do not otherwise specify the type of treatment process to be used to meet secondary treatment requirements.

68 Fed. Reg. at 63,046 (emphasis added).

No rule or regulation allows EPA to apply secondary treatment requirements to internal monitoring points or separate treatment processes, as long as the final

---

[7] The vast majority of POTWs that make maximum use of primary treatment capacity to adapt to peak wet weather flows do have accessible monitoring points at the point of discharge, so this exception is inapplicable to the case-at-hand.

effluent meets applicable limitations prior to discharge. As this Court has held, "[t]he statute is clear: The EPA may regulate the pollutant levels in a waste stream that is discharged directly into the navigable waters of the United States through a 'point source'; it is not authorized to regulate the pollutant levels in a facility's internal waste stream." *Am. Iron and Steel Inst. v. E.P.A.*, 115 F.3d 979, 996 (D.C. Cir. 1997).

EPA thus may impose effluent limits only on discharges from a point source into a navigable water, not on the flows between internal treatment units within a facility. EPA's application of the new draft rule to prohibit blending violates the CWA by purporting to regulate use of treatment technologies within POTW facilities. By stating that blending is a bypass of certain POTW equipment, and thus a violation of the bypass rule, EPA is dictating how POTWs should build and operate their facilities to meet effluent limits, contrary to the Act. Further, EPA is in effect prohibiting POTWs from using the available capacity of primary treatment processes that were designed with Agency approval and CWA grant funding, and permitted for decades under the NPDES program. This Court should follow the Eighth Circuit's decision in *Iowa League of Cities*, and its own precedent, and hold that EPA's attempt to regulate internal POTW facility design and operation exceeds the Agency's statutory authority.

### III.     The Agency's interpretation of the bypass rule violates the Act.

As an independent matter, the practice of using available primary treatment capacity to treat peak wet weather flows is not subject to the bypass rule, which prohibits the "intentional diversion of waste streams from any portion of a treatment facility."  40 C.F.R. § 122.41(m).

> The bypass provision does not dictate how users must comply, because it does not dictate what pretreatment technology the user must install.  Instead, the bypass provision merely requires that the user operate the technology it has chosen.

53 Fed. Reg. at 40,609.

The goal of the rule is to prevent dischargers from "shut[ting] down temporarily for no other reason than the belief that they will not be in technical violation of their permit."  *Natural Resources Defense Council, Inc. v. E.P.A.*, 822 F.2d 104, 124 (D.C. Cir. 1987).  The bypass rule requires "that applicable treatment technology, implemented for the purpose of achieving pollution reduction equivalent to 'best technology,' be operated as designed."  *Id.* at 123–124.

Here, NACWA member POTWs have constructed treatment facilities—often with EPA approval and CWA grant funding—that are specifically designed to cope with peak wet weather flows through blending.  The treatment system will trigger the blending process—consistent with the facility's design—when the integrity of the biological treatment systems are threatened and flows through the

13

system are at a point that would meet or exceed the capacity of the system. None of the facility's equipment is shut down, unutilized, or removed from service—instead, the facility performs precisely as designed and permitted.. The result is a discharge that complies with the Act and all NPDES permit effluent limitations developed to protect the nation's waters. POTWs that use blending to maximize the use of available primary treatment and comply with effluent limitations, while fully utilizing and maintaining the integrity of their biological treatment systems, are not "bypassing" facility equipment, and the bypass rule does not apply, because the facilities are operating as designed. In fact, but for the blending process, the treatment systems could otherwise become overwhelmed and inoperable, and then potentially create environmental risks.

## IV.    Conclusion

EPA has no authority to prevent POTWs from maximizing the use of primary treatment units and then blending primary and biologically-treated flows during peak wet weather events, as their treatment facilities were designed and permitted. The Court should reject EPA's ongoing attempt to apply its vacated re-interpretation of the secondary treatment and bypass rules to regulate flow inside a facility rather than at the point of discharge as outside the Agency's authority under the Act. Further, the Court should confirm that the use of available primary treatment capacity and blending as designed to treat excess wet weather flows and

to protect the integrity of biological treatment processes during peak wet weather events is not a prohibited bypass under the Act.

Respectfully submitted,

*/s/* Jeffrey S. Longsworth

Jeffrey S. Longsworth
1717 Pennsylvania Avenue N.W.
Suite 500
Washington, D.C. 20006
(202) 408-6918
jlongsworth@btlaw.com

Erika K. Powers
Jill M. Fortney
BARNES & THORNBURG LLP
One North Wacker Dr.
Suite 4400
Chicago, Illinois  60606
(312) 338-5904
erika.powers@btlaw.com
jill.fortney@btlaw.com

Amanda Waters
National Association of Clean Water Agencies
1816 Jefferson Place, NW
Washington, DC  20036
(202) 530-2758
AWaters@nacwa.org

15

## Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,761words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point, Times New Roman font.

## Certificate of Service

I hereby certify that, on this 30th day of October, 2015, I electronically filed the original of the foregoing document and its Statutory Addendum with the clerk of this Court by using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. Upon this brief's acceptance by the Court, I will also cause to be filed with the Clerk of the Court eight copies of the foregoing document and its Statutory Addendum, by depositing the same in the United States Mail, first-class postage prepaid, from One North Wacker Drive, Suite 4400, Chicago, Illinois 60606, and properly addressed to:

> **Clerk of the Circuit Court of the District of Columbia**
> E. Barrett Prettyman United States Courthouse
> Room 5205
> 333 Constitution Avenue, N.W.
> Washington, D.C. 20001-2866

Dated: October 30, 2015                    /s/ *Jeffrey S. Longsworth*
                                           *Counsel for Amicus Curiae*

ORAL ARGUMENT REQUESTED BUT NOT YET SCHEDULED

Appeal No. 14-1150

---

IN THE UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA

---

## CENTER FOR REGULATORY REASONABLENESS,

**Petitioner**

**v.**

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

**Respondent**

---

Petition for Review of Respondent Agency's Promulgations and Approvals of
Effluent Limitations and Other Limitations

---

## ADDENDUM TO BRIEF OF AMICUS CURIAE NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES
### (pertinent statues and regulations)

| | | |
|---|---|---|
| Jeffrey S. Longsworth | Erika K. Powers | Amanda Waters |
| BARNES & | Jill M. Fortney | National Association of |
| THORNBURG LLP | BARNES & | Clean Water Agencies |
| 1717 Pennsylvania | THORNBURG LLP | 1816 Jefferson Place, NW |
| Avenue N.W. | One North Wacker Dr. | Washington, DC 20036 |
| Suite 500 | Suite 4400 | (202) 533-1803 |
| Washington, D.C. 20006 | Chicago, Illinois 60606 | |
| (202) 408-6918 | (312) 338-5904 | |

October 30, 2015

# Table of Contents

**Statutes**

33 U.S.C. § 1311(a) ........................................................................................1

33 U.S.C. § 1342 ............................................................................................1

33 U.S.C. §§ 1362(11) ..................................................................................15

33 U.S.C. §§ 1362(12) ..................................................................................15

i

## 33 U.S.C. § 1311(a) – Effluent Limitations

(a) Illegality of pollutant discharges except in compliance with law

Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.


## 33 U.S.C. § 1342 – National pollutant discharge elimination system

(a)    Permits for discharge of pollutants

(1)    Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

(2)    The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

(3)    The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

(4)    All permits for discharges into the navigable waters issued pursuant to section 407 of this title shall be deemed to be permits issued under this subchapter, and permits issued under this subchapter shall be deemed to be permits issued under section 407 of this title, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this chapter.

(5)    No permit for a discharge into the navigable waters shall be issued under section 407 of this title after October 18, 1972. Each application for a permit under section 407 of this title, pending on October 18, 1972, shall be deemed to be an application for a permit under this

1

section. The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objective of this chapter to issue permits for discharges into the navigable waters within the jurisdiction of such State. The Administrator may exercise the authority granted him by the preceding sentence only during the period which begins on October 18, 1972, and ends either on the ninetieth day after the date of the first promulgation of guidelines required by section 1314(i)(2) of this title, or the date of approval by the Administrator of a permit program for such State under subsection (b) of this section, whichever date first occurs, and no such authorization to a State shall extend beyond the last day of such period. Each such permit shall be subject to such conditions as the Administrator determines are necessary to carry out the provisions of this chapter. No such permit shall issue if the Administrator objects to such issuance.

(b) State permit programs

At any time after the promulgation of the guidelines required by subsection (i)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each such submitted program unless he determines that adequate authority does not exist:

(1) To issue permits which--

(A) apply, and insure compliance with, any applicable requirements of sections 1311, 1312, 1316, 1317, and 1343 of this title;

(B) are for fixed terms not exceeding five years; and

(C) can be terminated or modified for cause including, but not limited to, the following:

(i) violation of any condition of the permit;

2

       (ii)    obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

       (iii)   change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

    (D)    control the disposal of pollutants into wells;

(2)

    (A)    To issue permits which apply, and insure compliance with, all applicable requirements of section 1318 of this title; or

    (B)    To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title;

(3)    To insure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application;

(4)    To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;

(5)    To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;

(6)    To insure that no permit will be issued if, in the judgment of the Secretary of the Army acting through the Chief of Engineers, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby;

(7)    To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement;

(8)    To insure that any permit for a discharge from a publicly owned treatment works includes conditions to require the identification in terms of character and volume of pollutants of any significant source introducing pollutants subject to pretreatment standards under section 1317(b) of this title into such works and a program to assure

3

compliance with such pretreatment standards by each such source, in addition to adequate notice to the permitting agency of (A) new introductions into such works of pollutants from any source which would be a new source as defined in section 1316 of this title if such source were discharging pollutants, (B) new introductions of pollutants into such works from a source which would be subject to section 1311 of this title if it were discharging such pollutants, or (C) a substantial change in volume or character of pollutants being introduced into such works by a source introducing pollutants into such works at the time of issuance of the permit. Such notice shall include information on the quality and quantity of effluent to be introduced into such treatment works and any anticipated impact of such change in the quantity or quality of effluent to be discharged from such publicly owned treatment works; and

(9) To insure that any industrial user of any publicly owned treatment works will comply with sections 1284(b), 1317, and 1318 of this title.

(c) Suspension of Federal program upon submission of State program; withdrawal of approval of State program; return of State program to Administrator

(1) Not later than ninety days after the date on which a State has submitted a program (or revision thereof) pursuant to subsection (b) of this section, the Administrator shall suspend the issuance of permits under subsection (a) of this section as to those discharges subject to such program unless he determines that the State permit program does not meet the requirements of subsection (b) of this section or does not conform to the guidelines issued under section 1314(i)(2) of this title. If the Administrator so determines, he shall notify the State of any revisions or modifications necessary to conform to such requirements or guidelines.

(2) Any State permit program under this section shall at all times be in accordance with this section and guidelines promulgated pursuant to section 1314(i)(2) of this title.

(3) Whenever the Administrator determines after public hearing that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw approval of such program. The Administrator shall not withdraw approval of any such program unless he shall first have

4

notified the State, and made public, in writing, the reasons for such withdrawal.

(4)    Limitations on partial permit program returns and withdrawals

A State may return to the Administrator administration, and the Administrator may withdraw under paragraph (3) of this subsection approval, of--

(A)    a State partial permit program approved under subsection (n)(3) of this section only if the entire permit program being administered by the State department or agency at the time is returned or withdrawn; and

(B)    a State partial permit program approved under subsection (n)(4) of this section only if an entire phased component of the permit program being administered by the State at the time is returned or withdrawn.

(d) Notification of Administrator

(1)    Each State shall transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State.

(2)    No permit shall issue (A) if the Administrator within ninety days of the date of his notification under subsection (b)(5) of this section objects in writing to the issuance of such permit, or (B) if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being outside the guidelines and requirements of this chapter. Whenever the Administrator objects to the issuance of a permit under this paragraph such written objection shall contain a statement of the reasons for such objection and the effluent limitations and conditions which such permit would include if it were issued by the Administrator.

(3)    The Administrator may, as to any permit application, waive paragraph (2) of this subsection.

(4)    In any case where, after December 27, 1977, the Administrator, pursuant to paragraph (2) of this subsection, objects to the issuance of a permit, on request of the State, a public hearing shall be held by the Administrator on such objection. If the State does not resubmit such

5

permit revised to meet such objection within 30 days after completion of the hearing, or, if no hearing is requested within 90 days after the date of such objection, the Administrator may issue the permit pursuant to subsection (a) of this section for such source in accordance with the guidelines and requirements of this chapter.

(e) Waiver of notification requirement

In accordance with guidelines promulgated pursuant to subsection (i)(2) of section 1314 of this title, the Administrator is authorized to waive the requirements of subsection (d) of this section at the time he approves a program pursuant to subsection (b) of this section for any category (including any class, type, or size within such category) of point sources within the State submitting such program.

(f) Point source categories

The Administrator shall promulgate regulations establishing categories of point sources which he determines shall not be subject to the requirements of subsection (d) of this section in any State with a program approved pursuant to subsection (b) of this section. The Administrator may distinguish among classes, types, and sizes within any category of point sources.

(g) Other regulations for safe transportation, handling, carriage, storage, and stowage of pollutants

Any permit issued under this section for the discharge of pollutants into the navigable waters from a vessel or other floating craft shall be subject to any applicable regulations promulgated by the Secretary of the department in which the Coast Guard is operating, establishing specifications for safe transportation, handling, carriage, storage, and stowage of pollutants.

(h) Violation of permit conditions; restriction or prohibition upon introduction of pollutant by source not previously utilizing treatment works

In the event any condition of a permit for discharges from a treatment works (as defined in section 1292 of this title) which is publicly owned is violated, a State with a program approved under subsection (b) of this section or the Administrator, where no State program is approved or where the Administrator determines pursuant to section 1319(a) of this title that a State with an approved program has not commenced appropriate enforcement action with respect to such permit, may proceed in a court of competent jurisdiction to restrict or prohibit the introduction of any pollutant into such

6

treatment works by a source not utilizing such treatment works prior to the finding that such condition was violated.

(i) Federal enforcement not limited

Nothing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title.

(j) Public information

A copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or permit, or portion thereof, shall further be available on request for the purpose of reproduction.

(k) Compliance with permits

Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title, except any standard imposed under section 1317 of this title for a toxic pollutant injurious to human health. Until December 31, 1974, in any case where a permit for discharge has been applied for pursuant to this section, but final administrative disposition of such application has not been made, such discharge shall not be a violation of (1) section 1311, 1316, or 1342 of this title, or (2) section 407 of this title, unless the Administrator or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application. For the 180-day period beginning on October 18, 1972, in the case of any point source discharging any pollutant or combination of pollutants immediately prior to such date which source is not subject to section 407 of this title, the discharge by such source shall not be a violation of this chapter if such a source applies for a permit for discharge pursuant to this section within such 180-day period.

(l) Limitation on permit requirement

(1)    Agricultural return flows

The Administrator shall not require a permit under this section for discharges composed entirely of return flows from irrigated agriculture, nor shall the Administrator directly or indirectly, require any State to require such a permit.

7

(2)   Stormwater runoff from oil, gas, and mining operations

The Administrator shall not require a permit under this section, nor shall the Administrator directly or indirectly require any State to require a permit, for discharges of stormwater runoff from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and which are not contaminated by contact with, or do not come into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations.

(3)   Silvicultural activities

(A)   NPDES permit requirements for silvicultural activities

The Administrator shall not require a permit under this section nor directly or indirectly require any State to require a permit under this section for a discharge from runoff resulting from the conduct of the following silviculture activities conducted in accordance with standard industry practice: nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, or road construction and maintenance.

(B)   Other requirements

Nothing in this paragraph exempts a discharge from silvicultural activity from any permitting requirement under section 1344 of this title, existing permitting requirements under section 1342 of this title, or from any other federal law.

(C)   The authorization provided in Section1 1365(a) of this title does not apply to any non-permitting program established under 1342(p)(6)2 of this title for the silviculture activities listed in 1342(l)(3)(A)3 of this title, or to any other limitations that might be deemed to apply to the silviculture activities listed in 1342(l)(3)(A)3 of this title.

(m)   Additional pretreatment of conventional pollutants not required

8

To the extent a treatment works (as defined in section 1292 of this title) which is publicly owned is not meeting the requirements of a permit issued under this section for such treatment works as a result of inadequate design or operation of such treatment works, the Administrator, in issuing a permit under this section, shall not require pretreatment by a person introducing conventional pollutants identified pursuant to section 1314(a)(4) of this title into such treatment works other than pretreatment required to assure compliance with pretreatment standards under subsection (b)(8) of this section and section 1317(b)(1) of this title. Nothing in this subsection shall affect the Administrator's authority under sections 1317 and 1319 of this title, affect State and local authority under sections 1317(b)(4) and 1370 of this title, relieve such treatment works of its obligations to meet requirements established under this chapter, or otherwise preclude such works from pursuing whatever feasible options are available to meet its responsibility to comply with its permit under this section.

(n) Partial permit program

(1)    State submission

The Governor of a State may submit under subsection (b) of this section a permit program for a portion of the discharges into the navigable waters in such State.

(2)    Minimum coverage

A partial permit program under this subsection shall cover, at a minimum, administration of a major category of the discharges into the navigable waters of the State or a major component of the permit program required by subsection (b) of this section.

(3)    Approval of major category partial permit programs

The Administrator may approve a partial permit program covering administration of a major category of discharges under this subsection if--

(A)    such program represents a complete permit program and covers all of the discharges under the jurisdiction of a department or agency of the State; and

(B)    the Administrator determines that the partial program represents a significant and identifiable part of the State program required by subsection (b) of this section.

9

(4)     Approval of major component partial permit programs

The Administrator may approve under this subsection a partial and phased permit program covering administration of a major component (including discharge categories) of a State permit program required by subsection (b) of this section if--

    (A)     the Administrator determines that the partial program represents a significant and identifiable part of the State program required by subsection (b) of this section; and

    (B)     the State submits, and the Administrator approves, a plan for the State to assume administration by phases of the remainder of the State program required by subsection (b) of this section by a specified date not more than 5 years after submission of the partial program under this subsection and agrees to make all reasonable efforts to assume such administration by such date.

(o) Anti-backsliding

(1)     General prohibition

In the case of effluent limitations established on the basis of subsection (a)(1)(B) of this section, a permit may not be renewed, reissued, or modified on the basis of effluent guidelines promulgated under section 1314(b) of this title subsequent to the original issuance of such permit, to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit. In the case of effluent limitations established on the basis of section 1311(b)(1)(C) or section 1313(d) or (e) of this title, a permit may not be renewed, reissued, or modified to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit except in compliance with section 1313(d)(4) of this title.

(2)     Exceptions

A permit with respect to which paragraph (1) applies may be renewed, reissued, or modified to contain a less stringent effluent limitation applicable to a pollutant if--

    (A)     material and substantial alterations or additions to the permitted facility occurred after permit issuance which justify the application of a less stringent effluent limitation;

    (B)     (B)

10

(i)    information is available which was not available at the time of permit issuance (other than revised regulations, guidance, or test methods) and which would have justified the application of a less stringent effluent limitation at the time of permit issuance; or

(ii)    the Administrator determines that technical mistakes or mistaken interpretations of law were made in issuing the permit under subsection (a)(1)(B) of this section;

(C)    a less stringent effluent limitation is necessary because of events over which the permittee has no control and for which there is no reasonably available remedy;

(D)    the permittee has received a permit modification under section 1311(c), 1311(g), 1311(h), 1311(i), 1311(k), 1311(n), or 1326(a) of this title; or

(E)    the permittee has installed the treatment facilities required to meet the effluent limitations in the previous permit and has properly operated and maintained the facilities but has nevertheless been unable to achieve the previous effluent limitations, in which case the limitations in the reviewed, reissued, or modified permit may reflect the level of pollutant control actually achieved (but shall not be less stringent than required by effluent guidelines in effect at the time of permit renewal, reissuance, or modification).

Subparagraph (B) shall not apply to any revised waste load allocations or any alternative grounds for translating water quality standards into effluent limitations, except where the cumulative effect of such revised allocations results in a decrease in the amount of pollutants discharged into the concerned waters, and such revised allocations are not the result of a discharger eliminating or substantially reducing its discharge of pollutants due to complying with the requirements of this chapter or for reasons otherwise unrelated to water quality.

(3)    Limitations

In no event may a permit with respect to which paragraph (1) applies be renewed, reissued, or modified to contain an effluent limitation which is less stringent than required by effluent guidelines in effect at the time the permit

11

is renewed, reissued, or modified. In no event may such a permit to discharge into waters be renewed, reissued, or modified to contain a less stringent effluent limitation if the implementation of such limitation would result in a violation of a water quality standard under section 1313 of this title applicable to such waters.

(p) Municipal and industrial stormwater discharges

(1)    General rule

Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under this section) shall not require a permit under this section for discharges composed entirely of stormwater.

(2)    Exceptions

Paragraph (1) shall not apply with respect to the following stormwater discharges:

(A)    A discharge with respect to which a permit has been issued under this section before February 4, 1987.
(B)    A discharge associated with industrial activity.
(C)    A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.
(D)    A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000.
(E)    A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

(3)    Permit requirements

(A)    Industrial discharges

Permits for discharges associated with industrial activity shall meet all applicable provisions of this section and section 1311 of this title.

(B)    Municipal discharge

Permits for discharges from municipal storm sewers--

(i)    may be issued on a system- or jurisdiction-wide basis;

12

(ii) shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

(iii) (shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.

(4) Permit application requirements

(A) Industrial and large municipal discharges

Not later than 2 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraphs (2)(B) and (2)(C). Applications for permits for such discharges shall be filed no later than 3 years after February 4, 1987. Not later than 4 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

(B) Other municipal discharges

Not later than 4 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraph (2)(D). Applications for permits for such discharges shall be filed no later than 5 years after February 4, 1987. Not later than 6 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

(5) Studies

The Administrator, in consultation with the States, shall conduct a study for the purposes of--

(A) identifying those stormwater discharges or classes of stormwater discharges for which permits are not required pursuant to paragraphs (1) and (2) of this subsection;

13

(B)    determining, to the maximum extent practicable, the nature and extent of pollutants in such discharges; and

(C)    establishing procedures and methods to control stormwater discharges to the extent necessary to mitigate impacts on water quality.

Not later than October 1, 1988, the Administrator shall submit to Congress a report on the results of the study described in subparagraphs (A) and (B). Not later than October 1, 1989, the Administrator shall submit to Congress a report on the results of the study described in subparagraph (C).

(6)    Regulations

Not later than October 1, 1993, the Administrator, in consultation with State and local officials, shall issue regulations (based on the results of the studies conducted under paragraph (5)) which designate stormwater discharges, other than those discharges described in paragraph (2), to be regulated to protect water quality and shall establish a comprehensive program to regulate such designated sources. The program shall, at a minimum, (A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines. The program may include performance standards, guidelines, guidance, and management practices and treatment requirements, as appropriate.

(q) Combined sewer overflows

(1)    Requirement for permits, orders, and decrees

Each permit, order, or decree issued pursuant to this chapter after December 21, 2000 for a discharge from a municipal combined storm and sanitary sewer shall conform to the Combined Sewer Overflow Control Policy signed by the Administrator on April 11, 1994 (in this subsection referred to as the "CSO control policy").

(2)    Water quality and designated use review guidance

Not later than July 31, 2001, and after providing notice and opportunity for public comment, the Administrator shall issue guidance to facilitate the conduct of water quality and designated use reviews for municipal combined sewer overflow receiving waters.

(3)    Report

14

Not later than September 1, 2001, the Administrator shall transmit to Congress a report on the progress made by the Environmental Protection Agency, States, and municipalities in implementing and enforcing the CSO control policy.

(r) Discharges incidental to the normal operation of recreational vessels

No permit shall be required under this chapter by the Administrator (or a State, in the case of a permit program approved under subsection (b)) for the discharge of any graywater, bilge water, cooling water, weather deck runoff, oil water separator effluent, or effluent from properly functioning marine engines, or any other discharge that is incidental to the normal operation of a vessel, if the discharge is from a recreational vessel.

## 33 U.S.C. §§ 1362 – Definitions

Except as otherwise specifically provided, when used in this chapter:

(11)    The term "effluent limitation" means any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance.

(12)    The term "discharge of a pollutant" and the term "discharge of pollutants" each means (A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft.